1
2
3
4
5
6           **UNITED STATES DISTRICT COURT**
7           **CENTRAL DISTRICT OF CALIFORNIA**
8
9   AMERICARE MEDSERVICES, INC.,              Lead Case No. 8:16-cv-1703-JLS-AFMx
10          Plaintiff,                        **ORDER GRANTING DEFENDANTS'**
11                                            **MOTIONS TO DISMISS**
        vs.
12
13  CITY OF ANAHEIM and CARE
    AMBULANCE SERVICE, INC.,
14
15          Defendants.
16
17  AMERICARE MEDSERVICES, INC.,              Consolidated With
                                              Case No. 8:16-cv-1596-JLS-AFMx
18          Plaintiff,
19
        vs.
20
21  CITY OF HUNTINGTON BEACH,
22          Defendant.
23
24
25
26
27
28

| | |
|---|---|
| AMERICARE MEDSERVICES, INC., | Consolidated With |
| Plaintiff, | Case No. 8:16-cv-1680-JLS-AFMx |
| vs. | |
| CITY OF ORANGE, | |
| Defendant. | |
| AMERICARE MEDSERVICES, INC., | Consolidated With |
| Plaintiff, | Case No. 8:16-cv-1724-JLS-AFMx |
| vs. | |
| CITY OF NEWPORT BEACH, | |
| Defendant. | |
| AMERICARE MEDSERVICES, INC., | Consolidated With |
| Plaintiff, | Case No. 8:16-cv-1759-JLS-AFMx |
| vs. | |
| CITY OF LA HABRA and CARE AMBULANCE SERVICE, INC., | |
| Defendants. | |

| | |
|---|---|
| AMERICARE MEDSERVICES, INC., | Consolidated With |
| Plaintiff, | Case No. 8:16-cv-1765-JLS-AFMx |
| vs. | |
| CITY OF FULLERTON and CARE AMBULANCE SERVICE, INC., | |
| Defendants. | |

| | |
|---|---|
| AMERICARE MEDSERVICES, INC., | Consolidated With |
| Plaintiff, | Case No. 8:16-cv-1795-JLS-AFMx |
| vs. | |
| CITY OF FOUNTAIN VALLEY and CARE AMBULANCE SERVICE, INC., | |
| Defendants. | |

| | |
|---|---|
| AMERICARE MEDSERVICES, INC., | Consolidated With |
| Plaintiff, | Case No. 8:16-cv-1804-JLS-AFMx |
| vs. | |
| CITY OF COSTA MESA and CARE AMBULANCE SERVICE, INC., | |
| Defendants. | |

| | |
|---|---|
| AMERICARE MEDSERVICES, INC., | Consolidated With |
| Plaintiff, | Case No. 8:16-cv-1806-JLS-AFMx |
| vs. | |
| CITY OF GARDEN GROVE and CARE AMBULANCE SERVICE, INC., | |
| Defendants. | |
| AMERICARE MEDSERVICES, INC., | Consolidated With |
| Plaintiff, | Case No. 8:16-cv-1817-JLS-AFMx |
| vs. | |
| CITY OF LAGUNA BEACH, | |
| Defendant. | |
| AMERICARE MEDSERVICES, INC., | Consolidated With |
| Plaintiff, | Case No. 8:16-cv-1832-JLS-AFMx |
| vs. | |
| CITY OF BUENA PARK and CARE AMBULANCE SERVICE, INC., | |
| Defendants. | |

| | |
|---|---|
| AMERICARE MEDSERVICES, INC.,<br><br>                Plaintiff,<br><br>        vs.<br><br>CITY OF SAN CLEMENTE, and CARE<br>AMBULANCE SERVICE, INC.,<br><br>                Defendants. | Consolidated With<br>Case No. 8:16-cv-1852-JLS-AFMx |

## I.    <u>INTRODUCTION</u>

Before the Court are twelve separate actions filed by Plaintiff AmeriCare MedServices, Inc. against twelve Orange County cities.[1]  In each action, the City Defendant filed a Motion to Dismiss.[2]  Plaintiff AmeriCare MedServices, Inc. opposed each Motion,[3] and each of the City Defendants replied.  Having taken the matter under submission and considered the parties' briefs and oral arguments, the Court GRANTS the City Defendants' Motions.

---

[1] In some of these actions, AmeriCare also included CARE Ambulance Service, Inc. as a Defendant.

[2] The City Defendants are the Cities of Huntington Beach, Orange, Anaheim, Newport Beach, La Habra, Fullerton, Fountain Valley, Costa Mesa, Garden Grove, Laguna Beach, Buena Park, and San Clemente.

[3] To support AmeriCare's Oppositions, Richard A. Narad, a professor of Health Services Administration at California State University Chico, has filed motions for leave to file amicus briefing in this matter.  An amicus brief is normally allowed only when (1) "a party is not represented competently or is not represented at all," (2) "the amicus has an interest in another case that may be affected by the holding in the present case," or (3) "the amicus can present unique information that can help the court in a way that is beyond the abilities the lawyers for the parties are able to provide."  *Gabriel Techs. Corp. v. Qualcomm Inc.*, No. 08CV1992 AJB (MDD), 2012 WL 849167, at *4 (S.D. Cal. Mar. 13, 2012) (citing *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997)).  Because the Court finds that Professor Narad fails to establish any of these bases, the Court DENIES his motions for leave to file amicus briefing.

## II.   **BACKGROUND**

The nature of AmeriCare's action against each City Defendant is substantively the same.  AmeriCare seeks relief from the City Defendants under the Sherman Act for each City's alleged abuse of its police and regulatory powers in designating a single provider of emergency ambulance service in its geographical area.  Because the history of each City's provision of emergency ambulance service is relevant to this case, the Court relates that history for each City as alleged in AmeriCare's amended complaints.

*Huntington Beach*.  Starting in the 1960s, the City of Huntington Beach had a de facto, unwritten agreement with Seals Ambulance Services, Inc. to provide emergency ambulance service within Huntington Beach city limits.  (Huntington Beach FAC ¶ 23, 8:16-cv-1596-JLS-AFMx, Doc. 14.)[4]  In 1986, Huntington Beach entered into a contract with Orange County in which the County would provide for the licensing and regulation of ambulance service within Huntington Beach.  (Huntington Beach FAC, Ex. A, 8:16-cv-1596-JLS-AFMx, Doc. 14-1.)  Seals continued to operate exclusively within Huntington Beach until 1993.  (Huntington Beach FAC ¶ 27.)  In 1993, Huntington Beach ceased using its existing provider and began providing emergency ambulance service itself.  (*Id.* ¶ 29.)

*Orange*.  In 1972, the City of Orange had a de facto, unwritten agreement with Morgan Ambulance Service, Inc. to provide emergency ambulance service within Orange city limits.  (Orange FAC ¶ 23, 8:16-cv-1680-JLS-AFM, Doc. 18.)  In 1979, Orange entered into a contract with Orange County in which the County would provide for the licensing and regulation of ambulance and convalescent transport services within Orange.  (Orange FAC, Ex. A, 8:16-cv-1680-JLS-AFM, Doc. 18-1.)  That contract was renewed in 1980, and then amended in 1986.  (*Id.*)  Morgan (which later became Medix Ambulance

---

[4] For ease of reference, citations to the parties' filings will identify the City Defendant involved in the action.  Thus, "Huntington Beach FAC" refers to AmeriCare's First Amended Complaint against Huntington Beach.  Here, the relevant filing can be found on the docket for the Huntington Beach Action, Case No. 8:16-cv-1596-JLS-AFM, at ECF No. 14.

Service) continued to operate exclusively within Orange until 1995.  (Orange FAC ¶¶ 23, 27.)  In 1995, Orange ceased using its existing provider and began providing emergency ambulance service itself.  (*Id.* ¶ 29.)

*Anaheim.*  As of June 1, 1980, the City of Anaheim had a de facto, unwritten agreement with Southland Ambulance to provide emergency ambulance service within Anaheim city limits.  (Anaheim FAC ¶ 26, 8:16-cv-1703-JLS-AFM, Doc. 19.)  Southland was purchased in 1993 and subsequently passed through several corporate owners before merging with its successor, American Medical Response, Inc. ("AMR").  (*Id.* ¶ 27.)  AMR served as the ambulance service provider within Anaheim until 1998.  (*Id.*)  In 1998, Anaheim ceased using its existing provider and granted an exclusive contract to CARE Ambulance Service, Inc.  (*Id.* ¶ 28.)

*Newport Beach.*  From the 1960s into the early 1990s, the City of Newport Beach had a de facto, unwritten agreement with Schaefer Ambulance Service, Inc. and Seals to provide emergency ambulance service within Newport Beach city limits.  (Newport Beach FAC ¶ 23, 8:16-cv-1724-JLS-AFM, Doc. 14.)  In 1994, Newport Beach entered into an exclusive contract with MedTrans to provide emergency ambulance service in Newport Beach.  (*Id.* ¶ 25.)  MedTrans did so until 1996, when Newport Beach ceased their relationship and began providing emergency ambulance service itself.  (*Id.* ¶¶ 25, 27.)

*La Habra.*  From 1979 until 1995, the City of La Habra had a de facto, unwritten agreement with Emergency Ambulance Service, Inc. to provide emergency ambulance service within La Habra city limits.  (La Habra FAC ¶¶ 25–26, 8:16-cv-1759-JLS-AFM, Doc. 19.)  In 1995, La Habra initiated a city-operated emergency ambulance service program which was operated by its municipal fire department.  (*Id.* ¶ 26.)  On June 27, 2005, La Habra disbanded its fire department and transferred its ambulance service to its municipal police department.  (*Id.*)  In 2008, La Habra granted an exclusive contract for emergency ambulance service to CARE.  (*Id.* ¶ 27.)

*Fullerton*.  As of June 1, 1980, the City of Fullerton had a de facto, unwritten agreement with Southland to provide emergency ambulance service within Fullerton city limits.  (Fullerton FAC ¶ 26, 8:16-cv-1765-JLS-AFM, Doc. 19.)  Southland eventually merged with AMR, which continued to provide emergency ambulance service in Fullerton until 2003.  (*Id.*)  In November 2003, Fullerton ceased using its existing provider and granted an exclusive contract to CARE for the provision of emergency ambulance service. (*Id.* ¶ 27.)

*Fountain Valley*.  As of June 1, 1980, the City of Fountain Valley had a de facto, unwritten agreement with Seals to provide emergency ambulance service within Fountain Valley city limits.  (Fountain Valley FAC ¶ 26, 8:16-cv-1795-JLS-AFM, Doc. 16.)  In 1998, Fountain Valley granted an exclusive contract to CARE, which it has renewed every year since.  (*Id.* ¶ 27.)

*Costa Mesa*.  As of June 1, 1980, the City of Costa Mesa had a de facto, unwritten agreement with Schaefer and Seals to provide emergency ambulance services within Costa Mesa city limits.  (Costa Mesa FAC ¶ 26, 8:16-cv-1804-JLS-AFM, Doc. 16.)  On August 1, 1981, Costa Mesa entered into a contract with Orange County to administer emergency response ambulance service within Costa Mesa.  (*Id.* ¶ 27.)  Schaefer and Seals continued to operate in Costa Mesa without a contract until the mid-1990s.  (*Id.* ¶ 28.)  In October 2000, Costa Mesa awarded an exclusive agreement for all emergency ambulance service within city limits to Schaefer.  (*Id.*)  That agreement was extended until September 2008. (*Id.*)  In 2008, Costa Mesa granted an exclusive contract to CARE.  (*Id.* ¶ 29.)

*Garden Grove*.  As of June 1, 1980, the City of Garden Grove had de facto, unwritten agreements with several ambulance services, including Schaefer, Southland (later acquired by AMR), and Medix, to provide emergency ambulance services within its city limits.  (Garden Grove FAC ¶ 26, 8:16-cv-1806-JLS-AFM, Doc. 18.)  In 1994, CareLine, a successor to Southland, was awarded an exclusive contract to provide

emergency ambulance service in Garden Grove.  (*Id.* ¶ 27.)  In 2000, Garden Grove granted an exclusive contract to CARE.  (*Id.* ¶ 28.)

*Laguna Beach*.  As of June 1, 1980, the City of Laguna Beach had de facto, unwritten agreements with several ambulance services, including Wind Ambulance, Inc., Scudders Ambulance Service, Inc., and Life Care Ambulance (later acquired by AMR), to provide emergency ambulance services within its city limits.  (Laguna Beach FAC ¶¶ 24–25, 8:16-cv-1817-JLS-AFM, Doc. 15.)  In 1996, Laguna Beach granted an exclusive contract to Doctor's Ambulance Service for emergency ambulance service.  (*Id.* ¶ 26.)

*Buena Park*.  As of June 1, 1980, the City of Buena Park did not have a written agreement in effect with its designated private emergency ambulance service provider.  (Buena Park FAC ¶ 26, 8:16-cv-1832-JLS-AFM, Doc. 18.)  In 1999, Buena Park granted an exclusive contract to CARE, which it has regularly extended to the present.  (*Id.* ¶ 27.)

*San Clemente*.  As of June 1, 1980, the City of San Clemente utilized multiple private ambulance services such as Doctor's, Life Care, Medix, and Scudders, to provide emergency ambulance services within its city limits.  (San Clemente FAC ¶¶ 26–27, 8:16-cv-1852-JLS-AFM, Doc. 17.)  At the time, San Clemente did not have a written agreement in effect with its providers.  (*Id.* ¶ 26.)  In 2015, San Clemente granted an exclusive contract to CARE for the provision of emergency ambulance service.  (*Id.* ¶ 28.)

On February 25, 2015, AmeriCare submitted a written request to the Orange County Emergency Medical Services Authority ("OCEMS") to be placed on rotation for emergency ambulance services within the geographical area of each of the City Defendants.  (City Defendants FACs.)[5]  OCEMS replied on March 18, 2015, directing AmeriCare to contact the city manager for each City Defendant.  (*Id.*)  AmeriCare submitted its written request to each City Defendant on March 19, 2015, explaining its correspondence with OCEMS and requesting that either the City Defendant arrange for

---

[5] To avoid citing to each FAC every time a fact common to each action is recited by the Court, the Court cites generally to all the FACs.  Pincites are omitted because the relevant information is not necessarily alleged on the same page or paragraph of each FAC.

AmeriCare to be placed into the emergency ambulance service rotation or state a position that it does not have responsibility for the administration of prehospital emergency medical services.  (*Id.*)  The City Defendants refused AmeriCare's request.  (*Id.*)

AmeriCare then filed the instant actions against the City Defendants.  AmeriCare asserts the following claims against all City Defendants: (1) monopolization and attempted monopolization under Section 2 of the Sherman Act; (2) declaration of rights under Section 1060 of the California Code of Civil Procedure; and (3) declaratory judgment under 28 U.S.C. § 2201.  (City Defendants FACs.)  In nine of the twelve actions, AmeriCare asserts the following additional claims: (1) conspiracy to monopolize under Section 2 of the Sherman Act; and (2) conspiracy to restrain trade under Section 1 of the Sherman Act.  (Anaheim FAC ¶¶ 71–91; La Habra FAC ¶¶ 68–88; Fullerton FAC ¶¶ 69–89; Fountain Valley FAC ¶¶ 68–88; Costa Mesa FAC ¶¶ 69–89; Garden Grove FAC ¶¶ 69–89; Laguna Beach FAC ¶¶ 63–81; Buena Park FAC ¶¶ 69–89; San Clemente FAC ¶¶ 70–90.)

The City Defendants now move to dismiss AmeriCare's claims against them.

## III.    LEGAL STANDARD

### A.    Rule 12(b)(1)

"A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence."  *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).  In other words, a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) can be facial or factual.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Id.*  "Dismissal for lack of subject matter jurisdiction is appropriate if the complaint, considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction."  *In re Dynamic Random Access Memory (DRAM)*

*Antitrust Litig.*, 546 F.3d 981, 984-985 (9th Cir. 2008).  "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Meyer*, 373 F.3d at 1039.  "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment."  *Id.*  When a motion is made pursuant to Federal Rule of Civil Procedure 12(b)(1), the plaintiff has the burden of proving that the court has subject matter jurisdiction. *Tosco Corp. v. Cmtys. for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001) *overruled on other grounds by Hertz Corp. v. Friend*, 559 U.S. 77 (2010).

**B.**   **Rule 12(b)(6)**

In deciding a motion to dismiss under Rule 12(b)(6), courts must accept as true all "well-pleaded factual allegations" in a complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Furthermore, courts must draw all reasonable inferences in the light most favorable to the non-moving party.  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  However, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

**IV.**   **DISCUSSION**

**A.**   **Interstate Commerce Requirement**

Three of the City Defendants raise the argument that AmeriCare's Sherman Act claims must be dismissed for lack of subject matter jurisdiction because AmeriCare fails to

plead that City Defendants' conduct has any effect on interstate commerce.  (Orange Mem. at 3, Doc. 24; Buena Park Mem. at 4, Doc. 24; San Clemente Mem. at 2, Doc. 23.)  Section 1 of the Sherman Act makes unlawful "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire . . . to monopolize any part of the trade or commerce among the several States."  15 U.S.C. § 2.  In *McLain v. Real Estate Board of New Orleans, Inc.*, the Supreme Court declared that "jurisdiction may not be invoked under [the Sherman Act] unless the relevant aspect of interstate commerce is identified."  444 U.S. 232, 242 (1980). Therefore, a plaintiff must allege a relationship between the defendant's conduct and interstate commerce in the pleadings.  *McLain*, 444 U.S. at 242.  The Ninth Circuit has interpreted *McLain* to mean that the relationship to interstate commerce "is not only an element of the alleged antitrust offense, but also a necessary jurisdictional requirement." *U.S. v. ORS, Inc.*, 997 F.2d 628, 629 (9th Cir. 1993).

To meet this requirement, the Ninth Circuit initially stated that a plaintiff must identify a relevant aspect of interstate commerce and show "as a matter of practical economics" that the defendant's activities have a "not insubstantial effect on the interstate commerce involved."  *Palmer v. Roosevelt Lake Log Owners Ass'n, Inc.*, 651 F.2d 1289, 1291 (9th Cir. 1981) (quoting *McLain*, 444 U.S. at 246) (internal quotation marks omitted). The Ninth Circuit has more recently stated, however, that a plaintiff must show that the defendant's conduct has a "substantial effect on interstate commerce."  *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1143 (9th Cir. 2003) (quoting *McLain*, 444 U.S. at 242) (internal quotation marks omitted); *see also Cherrone v. Florsheim Development*, No. CIV. 2:12-02069 WBS CKD, 2012 WL 4891743, at *2 (E.D. Cal. Oct. 12, 2012) (applying the "substantial effect" standard).

AmeriCare's pleadings fail under either standard.  AmeriCare pleads only that the City Defendants have "attempted and succeeded at maintaining an illegal monopoly in

1   restraint of interstate commerce."  (City Defendants FACs.)  There is no allegation of a

2   substantial effect on interstate commerce. [6]  (*See id.*)  There is no identification of any

3   aspect of interstate commerce that was affected by the City Defendants' conduct, nor any

4   allegations from which the Court can reasonably infer that, "as a matter of practical

5   economics," the City Defendants' conduct had a substantial (or not insubstantial) effect on

6   interstate commerce.

7          Accordingly, the Court concludes that dismissal of AmeriCare's Sherman Act

8   claims against the City Defendants is appropriate on this basis.  Typically, when a

9   deficiency in the plaintiff's complaint is of a type that can be cured by amendment, the

10  Court will dismiss the complaint with leave to amend.  *See Doe v. U.S.*, 58 F.3d 494, 497

11  ("[A] district court should grant leave to amend even if no request to amend the pleading

12  was made, unless it determines that the pleading could not possibly be cured by the

13  allegation of other facts.")  However, for reasons stated below, the Court finds that

14  granting leave to amend would be futile and inappropriate because even if AmeriCare were

15  to adequately plead substantial effects on interstate commerce, its Sherman Act claims

16  would incurably fail on other grounds.

17         **B.    *Burford* Abstention**

18         Seven of the City Defendants urge the Court to invoke *Burford* abstention and

19  decline to hear this case.  (Orange Mem. at 9–11; La Habra Mem. at 19–20, Doc. 28;

20  Fullerton Mem. at 18–19, Doc. 28; Costa Mesa Mem. at 19–20, Doc. 25; Garden Grove

21  Mem. at 15–16, Doc. 25; Buena Park Mem. at 15–17; San Clemente Mem. at 10–12.)

22  *Burford* abstention allows a court to "decline to rule on an essentially local issue arising

23  out of a complicated state regulatory scheme."  *U.S. v. Morros*, 268 F.3d 695, 705 (9th Cir.

---

24

25         [6] Even if AmeriCare included such an allegation, the bare allegation alone would not be
26  enough.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (noting that "a formulaic
    recitation of the elements of a cause of action will not do" and that "[f]actual allegations must be
27  enough to raise a right to relief above the speculative level"); *see also McLain*, 444 U.S. at 242
    ("[I]t is not sufficient merely to rely on identification of a relevant local activity and to presume an
28  interrelationship with some unspecified aspect of interstate commerce.")

1    2001).  Its purpose is to protect complex state administrative processes from undue federal

2    interference.  *See New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491

3    U.S. 350, 362 (1989).  In the Ninth Circuit, invocation of *Burford* abstention requires (1)

4    "that the state has chosen to concentrate suits challenging the actions of the agency

5    involved in a particular court"; (2) "that federal issues could not be separated easily from

6    complex state law issues with respect to which state courts might have special

7    competence"; and (3) "that federal review might disrupt state efforts to establish a coherent

8    policy."  *Id.* (quoting *Knudsen Corp. v. Nevada State Dairy Comm'n*, 676 F.2d 374, 377

9    (9th Cir. 1982)).

10         None of these requirements are met here.  There is no showing that California has

11   chosen to concentrate suits challenging municipal actions in a particular court.  At least

12   one of the City Defendants outright admits that the first factor is not met.  (Buena Park

13   Mem. at 15–16 ("[T]he first *Morros* factor is apparently absent (there seems to be no

14   special tribunal for claims relating to EMS exclusion) . . . .").)  Nor is this a case in which

15   the federal issues cannot easily be separated from state law issues or in which federal

16   review might disrupt state efforts to establish a coherent policy.  The mere possibility that

17   exercise of federal jurisdiction over federal antitrust claims might lead to a conflict with a

18   state court decision is not enough to require abstention.  *See Turf Paradise, Inc. v. Arizona

19   Downs*, 670 F.2d 813, 820 (9th Cir. 1982).  As the Supreme Court has stated, *Burford*

20   abstention represents an "extraordinary and narrow exception to the duty of the District

21   Court to adjudicate a controversy properly before it."  *Quackenbush v. Allstate Ins. Co.*,

22   517 U.S. 706, 728 (1996) (citation and internal quotation marks omitted).  Exercise of

23   jurisdiction is particularly important here because "federal courts have exclusive

24   jurisdiction over federal antitrust claims."  *Turf Paradise*, 670 F.2d at 821.

25         The Court therefore declines to apply *Burford* abstention to this case.

26

27

28

1

   ### C.   *Parker* **Immunity**

2       All City Defendants raise the defense of *Parker* immunity to AmeriCare's Sherman

3  Act claims.  (*See* City Defendants Mems.)  In *Parker v. Brown*, the Supreme Court held

4  that the Sherman Act does not apply to the actions of a state or the actions of its officers or

5  agents as directed by its legislature.  317 U.S. 341, 350–51 (1943).  However, state

6  agencies or subdivisions of a state are not exempt from the Sherman Act "simply by reason

7  of their status as such."  *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389,

8  408 (1978).  Rather, *Parker* immunity exempts anticompetitive conduct "engaged in as an

9  act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy

10 to displace competition with regulation or monopoly public service."  *Id.* at 413.  With

11 respect to local governmental entities, their activities are protected by *Parker* immunity "if

12 they are undertaken pursuant to a 'clearly articulated and affirmatively expressed' state

13 policy to displace competition."[7]  *FTC v. Phoebe Putney Health System, Inc.*, 133 S. Ct.

14 1003, 1011 (2013) (quoting *Cmty. Commc'ns Co. v. Boulder*, 455 U.S. 40, 52 (1982)).  It

15 is unnecessary for a state legislature to "expressly state in a statute or its legislative history

16 that the legislature intends for the delegated action to have anticompetitive effects."  *Id.*

17 (quoting *Town of Hallie v. Eau Claire*, 471 U.S. 34, 43 (1985)).  A state policy has been

18 clearly articulated and affirmatively expressed "if the anticompetitive effect was the

19 'foreseeable result' of what the State authorized."  *Id.* (quoting *Hallie*, 471 U.S. at 42).  An

20 anticompetitive effect is foreseeable if it is "the inherent, logical, or ordinary result of the

21 exercise of authority delegated by the state legislature."  *Id.* at 1012–13.

22      With these principles in mind, the Court analyzes whether a state policy of

23 anticompetitive conduct exists here.

24

25 _____

26      [7] "[U]nlike private parties, such entities are not subject to the 'active state supervision
   requirement' because they have less of an incentive to pursue their own self-interest under the
27 guise of implementing state policies."  *FTC v. Phoebe Putney Health System, Inc.*, 133 S. Ct.
   1003, 1011 (2013) (quoting *Town of Hallie v. Eau Claire*, 471 U.S. 34, 46–47 (1985)).
28

1    **1.    California Government Code § 38794**

2    Section 38794 of the California Government Code states that "[t]he legislative body

3    of a city may contract for ambulance service to serve the residents of the city as

4    convenience requires."  Cal. Gov't Code § 38794.  Over thirty years ago, the Ninth Circuit

5    relied on Section 38794 to hold that cities providing or contracting for ambulance service

6    were entitled to *Parker* immunity.  In *Springs Ambulance Service, Inc. v. City of Rancho

7    Mirage*, a private ambulance company brought suit under the Sherman Act after three

8    California cities decided to provide free municipal ambulance services through Riverside

9    County (which in turn engaged the California Department of Forestry to provide the

10   ambulance service).  745 F.2d 1270, 1271 (9th Cir. 1984).  In concluding that the

11   exclusion of the private ambulance company did not run afoul of the Sherman Act, the

12   court referred to Section 38794 of the California Government Code.  *Springs Ambulance*,

13   745 F.2d at 1273 (citing Cal. Gov't Code § 38794).  Even though the statute does not

14   explicitly authorize cities to abolish competition from private ambulance companies, the

15   court concluded that "the exclusion of private ambulance companies is a necessary or

16   reasonable consequence of providing subsidized municipal ambulance service, and was

17   surely within the contemplation of the legislature when it enacted Gov't Code § 38794."

18   *Id.*  In doing so, the court noted that "[w]here the residents of a city pay taxes to make

19   emergency ambulance service available, it would be anomalous to require that the city also

20   dispatch a private for-hire service with, or in alternation with, its own."  *Id.*  "To do so

21   would, in effect, force citizen users to pay twice for the same service."  *Id.*

22   Although *Springs Ambulance* has not been expressly overruled, the validity of its

23   reasoning is in question following the Supreme Court's decision in *Phoebe Putney*.  In

24   *Phoebe Putney*, the FTC filed an antitrust suit against the Hospital Authority of Albany-

25   Dougherty County to enjoin the hospital authority from acquiring a second hospital in

26   Dougherty County.  133 S. Ct. at 1008.  Acquisition of the hospital would have resulted in

27   the hospital authority owning the only two hospitals in Dougherty County.  *Id.*  The

28

question before the Court was "whether a Georgia law that creates special-purpose public entities called hospital authorities and gives those entities general corporate powers, including the power to acquire hospitals, clearly articulates and affirmatively expresses a state policy to permit acquisitions that substantially lessen competition." *Id.* at 1007.  In holding that the Georgia law did not express such a policy, the Court rejected the Eleventh Circuit's application of a "reasonably anticipated" test for determining whether an anticompetitive effect was foreseeable. *Id.* at 1009.  Rather, the anticompetitive effect had to be "the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature." *Id.* at 1012–13.

In applying that standard to the facts before it, the Supreme Court concluded that the Georgia law empowering hospital authorities to acquire hospitals did not clearly articulate and affirmatively express a state policy for hospital authorities to make acquisitions that would substantially reduce competition. *Id.* at 1012.  The Court distinguished the Georgia law from previous decisions finding an anticompetitive policy in other contexts.  "For example, in *Hallie* [*v. Eau Claire*], the Wisconsin statutory law regulating the municipal provision of sewage services expressly permitted cities to limit their service to surrounding unincorporated areas." *Id.* at 1013 (citing *Hallie*, 471 U.S. at 41).  In *City of Columbia v. Omni Outdoor Advertising, Inc.*, the clear articulation test was "easily satisfied" because "[t]he very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition." *Id.* (quoting *Omni*, 499 U.S. 365, 373 (1991)).

"By contrast, 'simple permission to play in a market' does not 'foreseeably entail permission to roughhouse in that market unlawfully.'" *Id.* (citation omitted).  "[T]he power to acquire hospitals . . . does not ordinarily produce anticompetitive effects." *Id.* at 1014.  The fact that a reasonable legislature could anticipate the possibility of anticompetitive conduct fell "well short of clearly articulating an affirmative state policy to displace competition with a regulatory alternative." *Id.*  Moreover, the fact that the state

legislature intended to improve access to affordable health care to all Georgia residents did not "logically suggest" that the legislature intended the hospital authorities to create hospital monopolies. *Id.* at 1015.

In light of the Court's reasoning in *Phoebe Putney*, the Ninth Circuit's analysis of Government Code Section 38794 no longer appears valid.[8] Nothing in Section 38794 explicitly confers on city governments the authority to act anti-competitively. Nor does the power to enter into contracts with ambulance service providers inherently restrict competition between those providers. A city could, after all, engage in a competitive bidding process to choose an ambulance service provider and regularly open bids for better contracts. As the Supreme Court noted, "[w]hen a State grants some entity general power to act . . . it does so against the backdrop of federal antitrust law." *Phoebe Putney*, 133 S. Ct. at 1013 (citing *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992)). Just because the California legislature could reasonably anticipate that a city government could use its Section 38794 powers in anticompetitive ways does not mean that the California legislature expressed an affirmative state policy that cities do so. *See id.* at 1014. Finally, to the extent Section 38794 furthers critical state interests in the public peace, health, and safety, *see* Cal. Health & Safety Code §13801, these interests do not logically suggest a

_____

[8] The City Defendants point to *United National Maintenance, Inc. v. San Diego Convention Center, Inc.*, 766 F.3d 1002 (9th Cir. 2014), to argue that *Springs Ambulance*'s interpretation of Section 38794 is still valid. *United National* addressed whether the San Diego Convention Center was empowered to hire cleaning staff internally to the exclusion of outside cleaning companies. The Ninth Circuit held that Sections 37506 and 37505 of the Government Code granted San Diego the authority to not just "play in the market," but to act anti-competitively with respect to its convention center. *United Nat'l*, 766 F.3d at 1010–11. In doing so, the court relied on the words "manage its use" in Section 37506 and Section 37505's requirement that funds from the convention center first pay for the center before being applied to the benefit of the municipality. *Id.* The court considered "managerial authorization" to be distinct from a general grant of corporate authority. *Id.* at 1010.

The Court does not find that *United National* conclusively affirms the holding in *Springs Ambulance*. The two cases examine different sections of the Government Code that prescribe different powers to municipalities. Moreover, Section 38794 does not address managerial authorization or any other factors that the Ninth Circuit relied on in *United National* to find state authorization of anti-competitive conduct.

1   state policy permitting anticompetitive conduct in furtherance of those interests.  *See*

2   *Phoebe Putney*, 133 S. Ct. at 1015.  Accordingly, Government Code Section 38794 by

3   itself does not appear to clearly articulate and affirmatively express a state policy to

4   displace competition in the emergency ambulance services market.

5           **2.**      **The California EMS Act**

6         However, Section 38794 is not the only California statute relevant to this issue.  In

7   1980, the California legislature enacted the Emergency Medical Services System and the

8   Prehospital Emergency Medical Care Personnel Act (the "EMS Act").  *County of San*

9   *Bernardino v. City of San Bernardino*, 15 Cal. 4th 909, 913, 915 (1997).  The EMS Act

10   created a comprehensive system governing virtually every aspect of prehospital emergency

11   medical services in California.  *Id.* at 915.  The Act created a two-tiered system of

12   regulation consisting of the Emergency Medical Services Authority at the state level and

13   local EMS agencies at the county level.  *Id.* at 915–16.  The original draft of the EMS Act

14   afforded no particular role for cities, but the version that was ultimately enacted included a

15   provision allowing cities that already provided prehospital emergency medical services to

16   continue doing so.  *Id.* at 916.  That provision stated, in relevant part, as follows:

18         Upon the request of a city . . . that contracted for or provided, as of June 1,

19         1980, prehospital emergency medical services, a county shall enter into a
          written agreement with the city . . . regarding the provision of prehospital

20         emergency medical services for that city . . . .  Until such time that an
          agreement is reached, prehospital emergency medical services shall be

21         continued at not less than the existing level, and the administration of
          prehospital EMS by cities . . . presently providing such services shall be

22         retained by those cities . . . .

24   Cal. Health and Safety Code §1797.201.  The California Supreme Court later interpreted

25   Section 1797.201 as permitting eligible cities to continue administering prehospital

15

emergency medical services[9] indefinitely.  *See County of San Bernardino*, 15 Cal. 4th at 922–24.

In 1982, the Supreme Court issued its opinion in *Community Communications Co., Inc. v. City of Boulder*, where for the first time a majority of the Court adopted the clear articulation test for extending *Parker* immunity to municipal activities.[10]  455 U.S. 40, 51 (1982).  In response, the California legislature amended the EMS Act in 1984, declaring that California's policy of "ensur[ing] the provision of effective and efficient emergency medical care" had been hindered by the Supreme Court's holding.  *See* Cal. Health and Safety Code § 1797.6(a).  Accordingly, the legislature explicitly stated its intention "to prescribe and exercise the degree of state direction and supervision over emergency medical services as will provide for state action immunity under federal antitrust laws for activities undertaken by local governmental entities carrying out their prescribed functions under this division."  Cal. Health and Safety Code § 1797.6(b).  "[T]his division" includes Section 1797.201.  Given that the EMS Act (1) contemplates the provision of prehospital emergency medical services by cities; and (2) contains a clear and express intention by the state to immunize from antitrust liability local government conduct in furtherance of the EMS Act, the Court concludes that *Parker* immunity extends to the City Defendants in this action.

### 3.    The City Defendants' Compliance with the EMS Act

Americare raises a number of arguments against this conclusion.  First, AmeriCare contends that the EMS Act contemplates anticompetitive conduct only in limited circumstances, none of which apply here.  (*See* AmeriCare Opps.)  Specifically, AmeriCare argues that (1) pursuant to Section 1797.224, only county EMS agencies can

---

[9] "Emergency medical services" are defined as "the services utilized in responding to a medical emergency."  Cal. Health and Safety Code § 1797.72.  Emergency ambulance service plainly falls within that definition.

[10] The clear articulation test first appeared in *City of Lafayette*, but only a plurality of the Court joined that portion of Justice Brennan's opinion.  *See* 435 U.S. 389.

create "exclusive operating areas" for emergency ambulance services; and (2) pursuant to Section 1797.201, cities can exclusively contract for or provide emergency ambulance services only to the extent they contracted for or provided those services as of June 1, 1980.  (*Id.*)  AmeriCare asserts that none of the City Defendants meet this requirement under Section 1797.201.  (*Id.*)

The Court does not find that Section 1797.224 precludes anticompetitive actions by cities in furtherance of the EMS Act.  Section 1797.224 explicitly states that "[n]othing in this section supersedes Section 1797.201."  Therefore, Section 1797.224 does not limit in any way a city's authority to maintain a monopoly emergency ambulance service under Section 1797.201 if that was the city's arrangement as of June 1, 1980.  Moreover, the California legislature broadly declared its intention to extend state action immunity to "local governmental entities" carrying out their prescribed functions under the EMS Act.  Cal. Health & Safety Code § 1797.6(b).  Had the California legislature intended to limit state action immunity to only county EMS agencies, or to exclude city governments from state action immunity, it could easily have drafted Section 1797.6 to reflect that intention.

As for the City Defendants' actual compliance with Section 1797.201, that issue is irrelevant to determining whether *Parker* immunity applies to their actions.  "The relevant question is whether the *state* intended the authorizing statute to have anticompetitive effects.  Thus, what the *city* does to implement that statute, rightly or wrongly, reveals nothing about the state's intent." *Traweek v. City and County of San Francisco*, 920 F.2d 589, 593 (9th Cir. 1990).  For purposes of determining whether *Parker* immunity applies to a city government, it is sufficient that the state law authorizes the city to act anti-competitively. *See Omni*, 499 U.S. at 371–72 (rejecting the contention that a municipality needs to be in compliance with the state law authorizing anticompetitive conduct for *Parker* immunity to apply).

1             **4.**       **Market Participant Exception**

2        Next, AmeriCare urges the Court to recognize a market participant exception to

3 *Parker* immunity.  (AmeriCare Opps.)  The Supreme Court has indicated that a "possible

4 market participant exception" might exist where state sovereigns act "not in a regulatory

5 capacity but as a commercial participant in a given market."  *Omni*, 499 U.S. at 374–79.

6 *Omni* did not shed much light on when exactly a state acts as a market participant rather

7 than as a regulator.  The only example given was *Union Pacific Railroad Co. v. United*

8 *States*, 313 U.S. 450 (1941), in which the Court held unlawful certain rebates and

9 concessions made by Kansas City, Kansas, in its capacity as the owner and operator of a

10 wholesale produce market.  *Omni*, 499 U.S. at 375.  The Court has not elaborated on the

11 subject since *Omni*, and it has not yet held that a market participant exception to state

12 action immunity exists.  *See Phoebe Putney*, 133 S. Ct. at 1010 n.4.  Although other

13 circuits have discussed the issue[11], the Ninth Circuit has not yet ruled on the matter.

14        The Court declines to recognize a market participant exception here.  First, as a

15 general matter an inquiry into whether a city is acting as a market participant would be in

16 tension with the Supreme Court's holding that a city is entitled to *Parker* immunity so long

17 as there is a state law authorizing anticompetitive conduct in furtherance of a state

18 regulatory scheme.  *See Omni*, 499 U.S. at 371–72.

19 _____

20      [11] Contrary to AmeriCare's assertions, it is unclear whether any circuit has in fact recognized a market participant exception.  The Federal Circuit mentioned the market participant

21 exception once in *Genentech, Inc. v. Eli Lilly and Co.*, 998 F.2d 931, 948 (Fed. Cir. 1993), *abrogated on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995), and never

22 discussed the issue again.  The Third Circuit once mentioned the exception in a footnote in *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239, 265 n.55 (3d Cir. 2001), but

23 district courts in the Third Circuit have not construed the footnote as holding that a market participant exception to *Parker* immunity exists in the Third Circuit.  *See Edinboro College Park*

24 *Apartments v. Edinboro Univ. Foundation*, No. 15-121 Erie, 2016 WL 6883295, at *4 (W.D. Pa. Mar. 1, 2016); *Wheeler v. Beard*, No. Civ. A. 03-4826, 2005 WL 1217191, at *6 (E.D. Pa. May

25 19, 2005).  Similarly, the Sixth Circuit suggested in *VIBO Corp., Inc. v. Conway*, 669 F.3d 675, 687 (6th Cir. 2012), that a market participant exception might exist, but a district court that later

26 considered *VIBO* did not consider it to definitively recognize a market participant exception in the antitrust context, *Wooster Industrial Park, LLC v. City of Wooster*, 55 F. Supp. 3d 990, 999 (N.D.

27 Ohio, 2014).

28

1        Moreover, in the present case, the City Defendants' provision of emergency

2   ambulance services does not implicate the exception.  Emergency ambulance services are

3   far removed from the example given in *Omni* of a city acting in the capacity of an owner

4   and operator of a wholesale produce market.  *See* 499 U.S. at 375 (citing *Union Pacific R.*

5   *Co. v. United States*, 313 U.S. 450, (1941)).  Even other courts that have addressed a

6   possible market participant exception have found that the exception does not apply if a

7   state entity is performing its traditional governmental functions.  *See, e.g.*, *Wooster*, 55 F.

8   Supp. 3d at 1000 (finding that the city defendant was not a market participant when it

9   contracted to build a new cell tower for use by its safety services); *Edinboro*, 2016 WL

10  6883295, at *4 (finding that a market participant exception would not apply where the

11  alleged injuries stem from a public university's obligations to provide education and

12  housing); *Wheeler*, 2005 WL 1217191, at *6 (finding that the Pennsylvania Department of

13  Corrections was acting in its governmental capacity in operating prison commissaries).

14       Here, the California legislature has expressly declared that the local provision of

15  emergency medical services, including ambulance services, is "critical to the public peace,

16  health, and safety of the state."  Cal. Health & Safety Code § 13801.  In enacting the EMS

17  Act, the legislature declared its intent "to promote the development, accessibility, and

18  provision of emergency medical services to the people of the State of California."  Cal.

19  Health & Safety Code § 1797.5.  The Act reflects the recognition that "one of the

20  preeminent functions of government in an organized society is the protection of the life

21  and health of its citizens."  *Ma v. City and County of San Francisco*, 95 Cal. App. 4th 488,

22  508 (2002), *disapproved of on other grounds by Eastburn v. Regional Fire Protection*

23  *Authority*, 31 Cal. 4th 1175 (2003).  "Along with fire suppression and crime prevention,

24  the provision of emergency medical assistance to persons faced with imminent life-

25  threatening conditions joins with them to form a triage of public services considered at the

26  core of vital civic functions."  *Id.*  Here, the State of California and the City Defendants are

27  operating emergency ambulance services as a quintessential governmental function.

28

1   Therefore, even if there were a market participation exception to *Parker* immunity, it

2   would not apply.

3           Accordingly, the Court concludes that *Parker* immunity applies to the City

4   Defendants in this action and that dismissal of AmeriCare's Sherman Act claims against

5   the City Defendants is appropriate.  Because a finding of *Parker* immunity conclusively

6   decides AmeriCare's Sherman Act claims, the Court finds it unnecessary to address the

7   City Defendants' arguments regarding the Local Government Anti-trust Immunity Act or

8   whether AmeriCare suffered an antitrust injury.

9           **D.      <u>Other Remaining Claims</u>**

10          Having dismissed AmeriCare's Sherman Act claims, no federal claims remain to be

11  adjudicated.  AmeriCare's remaining claims are for declaratory judgment under California

12  Code of Civil Procedure Section 1060 and 28 U.S.C. § 2201 declaring that the City

13  Defendants (1) lack authority to create an exclusive operating area under California Health

14  and Safety Code Section 1797.224, and (2) repudiated any rights they once had under

15  California Health and Safety Code Section 1797.201.  (*See* AmeriCare FACs.)  Both of

16  these claims are state law claims.  *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S.

17  667, 671–72 (1950) (explaining that Congress did not impliedly repeal or modify the

18  requirements of subject matter jurisdiction when it passed the Declaratory Judgment Act).

19  Given the early stage of litigation, the Court declines to exercise supplemental jurisdiction

20  over these claims.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)

21  ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and

22  only state-law claims remain, the federal court should decline the exercise of jurisdiction

23  by dismissing the case without prejudice.").

24  //

25  //

26  //

27  //

28

## V.     **CONCLUSION**

For the foregoing reasons, the Court GRANTS the City Defendants' Motions to Dismiss.  Because the Court finds that AmeriCare cannot amend its complaint in a way that would overcome the City Defendants' *Parker* immunity, AmeriCare's Sherman Act claims against the City Defendants are DISMISSED WITH PREJUDICE.  AmeriCare's claims for declaratory judgment against the City Defendants are DISMISSED WITHOUT PREJUDICE for AmeriCare to file in state court.

DATED: March 28, 2017

_____
JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE